**IN THE UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE:<br><br>Diana Kroll,<br><br>Debtor. | **Case No. 26-90459** |
| Danielle L. Daly,<br><br>Plaintiff,<br>v.<br><br>Diana Kroll,<br><br>Defendant. | |

**COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**

Plaintiff, Danielle L. Daly, pursuant to 11 U.S.C. §§ 523 and Federal Rule of Bankruptcy Procedure 4007, for its Complaint to Determine Non-Dischargeability of Debt owed to Plaintiff by Debtor/Defendant, states as follows:

**NATURE OF THE ACTION**

1. This Adversary Complaint is brought pursuant to 11 U.S.C. §§ 523 and Federal Rule of Bankruptcy Procedure 4007 for the purpose of objecting to and contesting the dischargeability of Defendant's obligations to Plaintiffs.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(b)(1), and 11 U.S.C. § 523.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

5. Plaintiff Danielle Daly resides in Kankakee Illinois.

6. Defendant/Debtor Diana Kroll resides in this District. Defendant was the owner and operator of TVMS Management Team LLC, doing business as Trouvaille Med Spa ("Trouvaille"), 1521 N. Covenant Street Suite 100, Bourbonnais, Illinois 60914.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over Defendant because Defendant filed her petition in this Court, resides in and has done business in Illinois.

8. Venue is proper in this Court because Defendant filed her petition in this Court, resides in and has done business in Illinois and in this District.

## GENERAL ALLEGATIONS

9. Plaintiff began working for Trouvaille as a licensed Aesthetician in June 2020. Plaintiff was to be paid on a commission basis, with service commissions at 40% and skin care product sale commission was 20%.

10. Within two years of the commencement of her employment Plaintiff's service commission rate was increased to 45%.

11. In or around 2023 Plaintiff was given the title of Aesthetics Manager/Lead Aesthetician due to her seniority.

12. During the period September 2025 to approximately February 2026, Defendant was away from the business on medical leave, at which time Plaintiff ran the business operations of estheticians.

13. On or about September 19, 2025, Defendant requested Plaintiff train more estheticians and would be paid $100 per day for training.

14. On September 27, 2025, Plaintiff worked at Manteno Oktoberfest at a Trouvaille booth for 5 hours without pay.

15. On December 22, 2025, Plaintiff discovered a payroll error that still has no resolution. Plaintiff's commission report showed $1,799.81 in commission services while her paystub showed commission services of $1,760.90. There were additional payroll errors in that paycheck, and after "correcting" it, there was still a balance of $38.91 missing. Defendant was made aware of this, said she would look into it, but no update was given on the status of this loss.

16. On February 4, 2026, Defendant expressed to Plaintiff that she was looking for "cost effective" microneedling tips. Defendant was searching on Amazon for alternative tips to Trouvaille's professional device. Knowing the quality would not be regulated, Plaintiff knew of a company that had microneedling tips made in the USA. Plaintiff sent Defendant the link to the Dr. Pen company for her to do her own research.

17. Sometime between February 4, 2026 and March 13, 2026, Defendant purchased a bulk order of the Dr. Pen microneedling tips and they did not fit their professional device (Rejuvapen NXT). Defendant suggested to return the tips or to purchase a device that they were compatible with. Defendant purchased a Dr. Pen device after this discussion. Defendant did not do any prior research on this company or their devices; Plaintiff only sent her the Dr. Pen website to look into products herself. Later, Plaintiff discovered Dr. Pen has an FDA-Cleared device that Defendant could have purchased, which she did not.

18. In February 2026, Plaintiff discovered that since the commencement of her employment she was only paid a 10% commission for skin care products, when she should have been paid 20%.

19. In mid-March 2026, Plaintiff and the other Estheticians had concerns about quality control/business practices taking place and were discussing this over a multiple-day discussion. Defendant's response to that was retaliatory.

20. On March 24, 2026, an Esthetics meeting was held via videoconference to discuss quality control. In the meeting, Plaintiff explicitly refused to use the illegal Dr. Pen M8S for treatments due to being not FDA-authorized. Microneedling is labeled a Class II medical device, and FDA states they need to be listed in the FDA's De Novo database or 510(k) Premarket Notification database. Defendant blamed Plaintiff for making the suggestion of the company, Defendant argued over the device, and gave 510(k) number: K230420 in the meeting. Plaintiff told Defendant to send over her research and Plaintiff would send her research. Plaintiff sent Defendant hers, and Defendant then removed herself from the chat. Later, Plaintiff searched the 510(k) clearance number she gave, which is the clearance number for the FDA-Cleared Dr. Pen A20, not the model M8S that was in-office. After this meeting, the target was put directly onto Plaintiff's back and Defendant's wage retaliation began in full-force.

21. On April 6, 2026, on the following paycheck (pay period 03/21/26-04/03/26) commission reports were sent to employees. An illegal 10% Cost to Company Deduction was taken discriminatorily (only estheticians) by Defendant from their paychecks without consent from the employees, including Plaintiff, in retaliation for Defendant being confronted about her illegal activities by Plaintiff as a whistleblower. Defendant asserted that she willfully deducted 10% ($610.05) from Plaintiff's wages to pay for her core business expenses (specifically: rent, utilities, wear and tear on equipment, wear and tear on beds, gloves, gauze, malpractice insurance for all providers, 3% credit card charges, and financing charges for Care Credit and Cherry). Under the Illinois Wage Payment and Collection Act (820 ILCS 115/9), passing overhead business costs to employees and deducting wages without contemporaneous, freely given written consent is strictly

illegal.

22. On April 6, 2026, Plaintiff confronted Defendant about the illegal deductions as well as the lack of pay for training. Defendant refused pay for training. Plaintiff has records of 11 days of training for which she was never compensated, totaling $1,100 in unpaid wages for training.

23. On April 20, 2026, Estheticians signed a formal letter informing Defendant they would be filing a wage claim with IDOL for the unlawful deductions. This letter was to be given to Defendant on Wednesday April 22; this letter was never given to Defendant for the reason listed below.

24. On April 22, 2026, Defendant advised Plaintiff and all staff that the store was closing. April 23, 2026 was the last day of operations.

25. On April 24, 2026, Plaintiff was issued by Defendant a final paycheck in the amount of $2,152.67. Plaintiff's commissions owed at that time was $3,256.62, leaving an underpayment of $1,103.95. Defendant's payment violated the Illinois Wage Payment and Collection Act ("Act"). Section 5 of the Act requires employers to pay all final compensation on the next regularly scheduled payday following separation.

26. Defendant failed to produce commission reports to Plaintiff. When Plaintiff asked Defendant to see the commission report, Defendant promised to provide to Plaintiff, but then claimed she no longer had access to the reports, which prevented Plaintiff from verifying her earnings and was a continuing violation of Defendant's obligation to maintain accurate wage records under 820 ILCS 1123/20.

27. On April 27, 2026, Plaintiff notified Defendant Plaintiff believed payment was missing from 04/04/26-04/10/26 and asked when commission reports would be emailed. Previous pay period was 03/21/26-04/03/26 and final paycheck showed 04/11/26-04/24/26. Defendant said

"I will try and get that in the next few days".

28. Under the Act the earned commissions must be included in final compensation and paid no later than the next regularly scheduled payday.

29. On May 4, 2026, Plaintiff sent Defendant a demand letter via certified mail and email, seeking a total of $4,744.00, broken down as follows: (1) Unpaid Commissions (2/24/26 pay period): $1,103.95; (2) Unpaid Tips (final pay period): $150.00, (3) Unpaid Training Compensation (11 days @ $100/day): $1,100.00. Not Listed in that letter was the following owed to Plaintiff (4) the residual $60 missing from one-time payment of $40, (5) Unpaid Accrued PTO (72 hours @ $20/hr): $340.00, (6) Unpaid Mandatory Meetings and Events (17 hours @ $20/hr): $340.00 and (7) Unlawful Dedutions (10% CTC Assessment): $610.05.

30. Under the Act, Plaintiff's final compensation was required to include the monetary equivalent of earned vacation and earned holidays. Plaintiff also is owed vacation pay in the amount of $1,440.00.

31. Plaintiff is also owed $340.00 in unpaid wages for attending meetings.

32. On May 22, 2026, Plaintiff filed a wage claim with the Illinois Department of Labor.

33. On July 23, 2026, Defendant filed for Chapter 7 in this Court.

34. Under the Act, employers who fail to pay final compensation are liable for: (a) the amount of underpayment or non-payment, (b) compensatory damages of 5% of the underpayment or non-payment, (c) costs and reasonable attorneys' fees, (d) punitive pre-judgment interest of 2% of the underpayment or non-payment for each month contractually earned wages remain unpaid.

35. Defendant is liable for the unpaid wages under 820 ILCS 115/13, which provides that "Any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the

corporation." The Illinois Administrative Code further provides that such persons shall be individually liable for an aggrieved employee's wages or final compensation. 56 Ill. Admin. Code § 300.620(b). Illinois Minimum Wage Law, 820 ILCS 105 *et seq.* also provides for treble damages for unpaid wages.

36. Under 820 ILCS 115/14(a), in a civil action under the Act, the employee shall also recover costs and all reasonable attorney's fees. This fee-shifting provision is mandatory.

37. Plaintiff also suffered emotional distress in pursuing these claims. During the time period in which Defendant illegally cut Plaintiff's pay Plaintiff was pregnant, which Defendant knew, and Plaintiff had a maternity leave scheduled shortly after the store closed.

**COUNT I -- 11 U.S.C. § 523(a)(2)(A)**

38. Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 37 of Plaintiff's Complaint as if fully set forth herein.

39. 11 U.S.C. § 1192(2) provides that a subchapter V debtor may not be discharged from debts "of the kind specified in section 523(a)".

40. 11 U.S.C. § 523(a)(2)(A) provides that "a discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge …. Any debt…for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained, by…false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

41. By engaging in schemes as part of a deliberate attempt to underpay Plaintiff, the Debtor obtained services from Plaintiff through, and among other violations, by willfully making false representations, and willfully circumventing wage payment laws.

42. Debtor/Defendant deceived Plaintiff with her misstatements by failing to pay wages and promised raise of pay Plaintiff. Plaintiff justifiably relied on Debtor's misstatements and

omissions and was damaged as a proximate result thereof by being deprived of the legally required wages for her services. Because an employer is tasked with accounting for hours, and despite knowing the number of hours Plaintiff worked each week for the Defendant and Plaintiff having no knowledge of the legally required wages to be compensated and the circumstances of employment left Plaintiffs dependent upon the Debtor for a true and correct accounting of hours and calculation of pay.

43. Plaintiff was injured by her reliance on Defendant's conduct. Defendant's deceptive conduct caused Plaintiff significant losses to her income in the form of unpaid wages.

44. As such, Debtor obtained services from Plaintiff by false pretenses, false representations and/or actual fraud and, therefore, the claims asserted against the Debtor by Plaintiff is not dischargeable in bankruptcy pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.

**COUNT II – 11 U.S.C. § 523(a)(6)**

45. Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 44 of Plaintiff's Complaint as if fully set forth herein.

46. 11 U.S.C. § 1192(2) provides that a subchapter V debtor may not be discharged from debts "of the kind specified in section 523(a)".

47. 11 U.S.C. § 523(a)(6) provides that "a discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt…for willful and malicious injury by the debtor to another entity or to the property of another entity". Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

48. Debtor has willfully and maliciously violated labor laws by failing to pay Plaintiff's pay.

49. Debtor has acted willfully and maliciously because despite awareness of the obligations of the Federal and Illinois laws; Debtor failed to pay Plaintiff wages. Debtor acted maliciously insofar as Debtor's failure to pay wage was intentional and wrongful acts which caused Plaintiff injury in the form of lost wages and were in conscious disregard of Debtor's legal duties and were without just cause or excuse.

50. Debtor, by intending to deprive Plaintiff of the economic value and entitlement to statutorily mandated wages, Debtor willfully and maliciously caused intentional economic loss and injury to Plaintiff and therefore, the claims asserted against the Debtor by Plaintiff are not dischargeable in bankruptcy pursuant to Section 523(a)(6) of the Bankruptcy Code.

51. Debtor's failure to pay Plaintiffs properly caused a willful and malicious injury to them such that the debts owed by

52. Debtor to Plaintiff, including attorneys' fees and costs to which she is entitled. Therefore, pursuant to 11 U.S.C. § 523(a)(6), Debtor Defendant is not entitled to a discharge of such debts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Danielle L. Daly respectfully requests that this Honorable Court determine that the debt owed to Plaintiff by Defendant constitutes a nondischargeable debt pursuant to 11 U.S.C. §523(a)(2)(A) and § 523(a)(6), for an award of attorneys' fees and costs incurred in prosecuting this action and such further relief as this Court deems just and proper.

DANIELLE L. DALY

By: /s/ *James K. Borcia*
One of Her Attorneys

James K. Borcia (*jborcia@tresslerllp.com*)
Tressler LLP
233 South Wacker Drive, 61st Floor
Chicago, IL 60606
(312) 627-4000 (13994-1) 4912-3538-9145, v. 1